ORDERED.

**Dated: March 31, 2023**

*Caryl E. Delano*
Caryl E. Delano
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re: | Case No. 2:22-bk-00395-FMD |
| | Chapter 7 |
| Jennifer Susanne Savage Ingole, | |
| Debtor. | |
| _____/ | |

**MEMORANDUM OPINION SUSTAINING IN PART
AND OVERRULING IN PART STOREY MOUNTAIN, LLC'S
LIMITED OBJECTION TO DEBTOR'S CLAIM OF EXEMPTION**

This Memorandum Opinion supplements the Court's February 28, 2023 *Order Sustaining in Part and Overruling in Part Storey Mountain's Limited Objection to Debtor's Claim of Exemption*.[1]

---

[1] Doc. No. 129. (The Court reserved the right to supplement its ruling.)

I.    BACKGROUND

Debtor and her husband, Gary Ingole, were married in October 2005.[2]

On February 24, 2006, Debtor signed a Commercial Guaranty (the "Guaranty") of a debt that GJZ, Inc. ("GJZ") owed to Florida Gulf Bank. Under the Guaranty, Debtor consented to "the issuance of a continuing writ of garnishment or attachment against Guarantor's disposable earnings, in accordance with Section 222.11, Florida Statutes, in order to satisfy, in whole or in part, any money judgment entered in favor of Lender."[3]

Florida Gulf Bank was later acquired by Iberiabank. In 2014, Iberiabank filed a state court foreclosure action against GJZ as the principal debtor on loans owed to it, and against Debtor and Mr. Ingole as guarantors of the debt. A foreclosure sale was held in December 2014 and in November 2015 the state court entered a Consent Deficiency Judgment (the "Judgment") against Debtor and Mr. Ingole.[4] Thereafter, Iberibank assigned the Judgment to Storey Mountain, LLC ("Creditor").[5]

On April 5, 2022, Debtor filed a Chapter 7 bankruptcy petition. On her schedule of personal property, Debtor listed accounts at Suncoast Credit Union ("Suncoast"): Checking Account 0050 with a balance of $1,487.10 and Money Market

---

[2] Creditor's Ex. 3, Doc. No. 101-3.
[3] Creditor's Ex. 1, Doc. No. 101-1, p. 3.
[4] Claim 5-1, Part 2.
[5] Claim 5-1, Part 3.

Account 0068 with a balance of $26,709.66.[6] She claimed both accounts as exempt,[7] and Creditor objected to the claimed exemptions.[8] The Court conducted a trial on December 14, 2022. On February 23, 2023, the Court announced its oral ruling.[9]

## II.     DISCUSSION

Under Fed. R. Bankr. P. 4003(c), in any hearing on a creditor's objection to exemptions, "the objecting party has the burden of proving that the exemptions are not properly claimed."[10] Generally, claims of exemptions under Florida law "are liberally construed and broadly interpreted in favor of the claimed exemption."[11]

### A.     Checking Account 0050

On April 21, 2004—prior to their marriage—Debtor and Mr. Ingole opened Checking Account 0050 at Suncoast. Debtor signed the signature card as "owner" and Mr. Ingole signed the signature card as "joint owner."[12] Debtor's paychecks from her employer are deposited into Checking Account 0050.[13]

On May 19, 2014, Mr. Ingole signed a Suncoast document titled "Joint Ownership Release" (the "Ownership Release") in which he directed the removal of

---

[6] Doc. No. 12, p. 5.
[7] Doc. No. 12, p. 10-11.
[8] Doc. No. 38.
[9] Doc. No. 141, Transcript of hearing held on February 23, 2023.
[10] Fed. R. Bankr. P. 4003(c).
[11] *In re Holmes*, 414 B.R. 868 (Bankr. S.D. Fla. 2009).
[12] Creditor's Ex. 2, Doc. No. 101-2.
[13] *See* Debtor's Ex. 2, Doc. No. 99-2, pp. 5, 15.

3

his name from Checking Account 0050 and relinquished all ownership rights in the account.[14] Debtor testified at trial that Mr. Ingole signed the Ownership Release during a brief period in which they were having marital difficulties and were separating their finances.

Debtor testified that she and Mr. Ingole later reconciled, and at some point, they added Mr. Ingole's name back onto Checking Account 0050. In support of her testimony, Debtor offered Suncoast's monthly account statements for September 15, 2021 through October 14, 2021 and October 15, 2021 through March 14, 2022 (the "Suncoast Statements").[15] For Checking Account 0050, the Suncoast Statements state "Joint Owner – GARY LEE INGOLE." However, Debtor did not offer into evidence any signed document or documentation from Suncoast that would evidence Mr. Ingole's reinstatement as a joint owner of Checking Account 0050.

On the schedule of exemptions she filed in her bankruptcy case, Debtor claimed Checking Account 0050 as exempt earnings by a head of family under Fla. Stat. § 222.11(2)(b)[16] and as exempt entireties property under 11 U.S.C. § 522(b)(3)(B).

Creditor contends that Debtor waived the "head of family" exemption under § 222.11 when she signed the Guaranty, and that Checking Account 0050 has not been

---

[14] Creditor's Ex. 4, Doc. No. 101-4.
[15] Debtor's Exs. 2, 3, Doc. Nos. 99-2, 99-3.
[16] Debtor's bankruptcy schedules reflected that she was the primary support of her family. (Doc. No. 12, pp. 21-24, 28-29.)

4

held as tenants by the entireties since 2014, when Mr. Ingole released his ownership interest in the account.

### 1. Debtor waived the head of family exemption as to Checking Account 0050.

Fla. Stat. § 222.11 is titled "Exemption of wages from garnishment." Under Fla. Stat. § 222.11(2)(b), the "[d]isposable earnings of a head of a family, which are greater than $750 a week, may not be attached or garnished unless such person has agreed otherwise in writing."[17] For purposes of the statute, "head of family" includes "any natural person who is providing more than one-half of the support for a child or other dependent."[18]

The head of family exemption should be construed liberally in favor of the debtor because of the statute's purpose to protect the head of a family from financial reversal and allow the family breadwinner to provide family support with money from his or her labor. However, a head of family may waive the protection provided by the exemption in accordance with the requirements of § 222.11(2)(b).

In 2010, § 222.11(2)(b) was amended to impose "specific and stringent requirements for waiving the garnishment exemption."[19] Under the new requirements, an agreement to waive the exemption must be contained in a separate

---

[17] Fla. Stat. § 222.11(2)(b).
[18] Fla. Stat. § 222.11(1)(c).
[19] *Maki v. Multibank 2009-1 RES-ADC Venture, LLC*, 310 So. 3d 1056, 1057 (Fla. 2d DCA 2020).

document, must be in the exact language set out in the statute, must be in large type, and must be signed by the consumer and the creditor.[20]

But the more stringent requirements do not apply to waivers that were made before the 2010 amendments, when the statute provided that the head of a family could waive the exemption by "agree[ing] otherwise in writing."[21] The pre-2010 version of the statute "does not prescribe any particular language to effect a waiver of the wage exemption. The only statutory requirement for a waiver of the exemption is that the agreement be in writing."[22]

Here, Debtor claims Checking Account 0050 as exempt under Fla. Stat. § 222.11(2)(b). It is undisputed that Debtor is the primary earner in her household and a "head of family" under the statute.

However, Debtor signed the Guaranty in 2006, expressly consenting to the garnishment of her earnings to satisfy any money judgment in favor of the lender on the debt; her consent specifically referred to Fla. Stat. § 222.11.[23] In her Closing Argument, Debtor does not contend that her consent does not apply to the Judgment.

---

[20] Fla. Stat. § 222.11(2)(b).
[21] *Maki*, 310 So. 3d at 1058 ("The Makis acknowledge that applying the 2010 exemption waiver requirements to their contract is constitutionally barred."); *Castro v. Mercantil Commercebank*, 305 So. 3d 623, 626 (Fla. 3d DCA 2020); *USAmeriBank v. Klepal*, 100 So. 3d 56, 59 (Fla. 2d DCA 2011).
[22] *Klepal*, 100 So. 3d at 59 (quoted in *Castro*, 305 So. 3d at 625).
[23] Creditor's Ex. 1, Doc. No. 101-1, p. 3.

Instead, she argues only that the form of her consent does not comply with the requirements for a waiver found in the current version of § 222.11(2)(b).[24]

But Debtor's consent is governed by the version of § 222.11(2)(b) that was in effect in 2006, and that version only required that a waiver of the head of family exemption be in writing. For example, in *USAmeriBank v. Klepal*,[25] the borrower signed a consent in 2007 using the precise waiver language found in the Guaranty that Debtor signed in 2006. The court in *Klepal* ruled that the borrower's consent was a written agreement sufficient to waive the head of family exemption, in part because it referred to § 222.11 and expressed the parties' intent to authorize the garnishment of the borrower's disposable earnings.[26]

Under the reasoning applied in *Klepal*, the Court finds that Creditor met its burden of proof to establish that Debtor waived the head of family exemption under § 222.11(2)(b) by consenting to garnishment of her disposable earnings. Therefore, Checking Account 0050 is not exempt under Fla. Stat. § 222.11(2)(b).

### 2. Mr. Ingole's release of his interest in Checking Account 0050 terminated the tenancy by the entireties.

In *Beal Bank, SSB v. Almand and Associates*,[27] the Supreme Court of Florida held that a bank account that is jointly owned by a husband and wife is presumed to be

---

[24] Doc. No. 113, pp. 2-4.
[25] 100 So. 3d 56 (Fla. 2d DCA 2011).
[26] *Klepal*, 100 So. 3d at 60-61.
[27] 780 So. 2d 45 (Fla. 2001).

7

entireties property unless the signature card specifically designates otherwise, as long as the account satisfies the six unities required to create a tenancy by the entirety:

> [A]s between the debtor and a third-party creditor (other than the financial institution into which the deposits have been made), if the signature card of the account does not expressly disclaim the tenancy by the entireties form of ownership, a presumption arises that a bank account titled in the names of both spouses is held as a tenancy by the entireties as long as the account is established by husband and wife in accordance with the unities of possession, interest, title, and time and with right of survivorship.[28]

In 2008, after the Supreme Court of Florida's ruling in *Beal Bank*, Fla. Stat. § 655.79(1) was amended to provide that "[a]ny deposit or account made in the name of two persons who are husband and wife shall be considered a tenancy by the entirety unless otherwise specified in writing."[29] The amendment "codified the presumption judicially established in *Beal Bank*, and, consistent with *Beal Bank's* holding, the presumption does not change the required six unities."[30]

Once the presumption arises that a bank account is held by spouses as tenants by the entirety, "the burden shifts to the creditor to prove by a preponderance of the evidence that a tenancy by the entirety was not created."[31]

---

[28] *Beal Bank*, 780 So. 2d at 58.
[29] Fla. Stat. § 655.79(1).
[30] *In re Benzaquen*, 555 B.R. 63, 67 (Bankr. S.D. Fla. 2016).
[31] *Orso as Successor Trustee v. Sipe*, 2022 WL 1138296, at *1 (M.D. Fla. Mar. 30, 2022).

8

Case 2:22-bk-00395-FMD   Doc 146   Filed 03/31/23   Page 9 of 18

Here, Debtor and Mr. Ingole opened Checking Account 0050 as joint owners in 2004, but Mr. Ingole relinquished his ownership rights in the account when he signed the Ownership Release in 2014. Creditor contends that the signed Ownership Release constitutes a written disclaimer of the entireties designation under Fla. Stat. § 655.79(1).[32]

Debtor does not directly address the effect of Mr. Ingole's Ownership Release. Instead, she asserts that the funds in Checking Account 0050 were entireties property even after Mr. Ingole signed the Ownership Release. At trial, Debtor suggested that Mr. Ingole's continuing interest in Checking Account 0050 is evidenced by the appearance of his name as "joint owner" on Suncoast's monthly statements for the account.[33] In addition, Debtor asserts in her Closing Argument (a) that Fla. Stat. § 655.79(a) applies to accounts *or deposits*, so that "each and every *deposit*" of entireties property into an account maintains its entireties status, even if "the account as a whole" is not an entireties account; (b) that Checking Account 0050 had a negative balance on March 1, 2022, meaning that all deposits prior to that date had been spent, were not present in the account on the petition date, and are therefore irrelevant to

---

[32] Doc. No. 107, p. 4.
[33] Debtor's Ex. 2, Doc. No. 99-2, pp. 43-51. Creditor objected to the admission of Debtor's Exhibit 2 (Suncoast's account statements) on the grounds of relevance and inadmissible parol evidence that cannot be used to contradict the Ownership Release. The Court concludes that Exhibit 2 is admissible under *Beal Bank*; Creditor's objection is overruled.

9

Debtor's claim of exemption in her bankruptcy case;[34] and (c) that Debtor intended all deposits after March 1, 2022, to be held as entireties property under Fla. Stat. § 655.79(1).[35]

But when Mr. Ingole signed the Ownership Release on May 19, 2014, he affirmatively surrendered his ownership rights in Checking Account 0050. Although Debtor testified at trial that Mr. Ingole was later added back onto Checking Account 0050, she did not produce any documents that evidenced the reinstatement of Mr. Ingole's ownership interest in the account other than the Suncoast Statements. For example, Debtor did not offer the testimony of a Suncoast representative or any evidence that Suncoast had changed the information on its statements to reflect Debtor's sole ownership of the account after Mr. Ingole signed the Ownership Release.

And even if Debtor had offered such evidence, the Supreme Court of Florida made clear in *Beal Bank* that a bank account is held as tenants by the entireties only if it satisfies the unities of marriage, possession, interest, title, and time with right of survivorship. Although Checking Account 0050 was originally held by Debtor and Mr. Ingole as tenants by the entireties, Mr. Ingole terminated the unities when he

---

[34] Debtor's Ex. 2, Doc. No. 99-2, pp. 46-47.
[35] Doc. No. 113, p. 4.

signed the Ownership Release and specified in writing that he did not hold an interest in the account.

The addition of Mr. Ingole's name to Checking Account 0050 after a time period when it was solely owned by Debtor did not restore the required unities. In *In re McCuan*,[36] the district court held that the addition of a spouse's name to an existing account does not convert the account to a tenancy by the entireties account. The court stated:

> Florida law suggests that a transfer such as the one alleged in this Complaint does *not* convert property into TBE property. The Florida Supreme Court in *Beal Bank* declined to overturn the lower court's unanimous decision that a bank account "lacked the unities of time and title and thus [was] not held as tenancy by the entirety" when a husband opened the account alone, and later added his wife as co-owner. *Beal Bank, SSB v. Almand and Assocs.*, 710 So. 2d 608, 616 (Fla. 5th DCA 1998) (Harris, J., concurring in part and dissenting in part), *overruled on other grounds by* 780 So. 2d 45 (Fla. 2001). Some Bankruptcy Courts have followed this approach. *In re Aranda*, 08–26059–BKC–PGH, 2011 WL 87237, at *3 (Bankr. S.D. Fla. Jan. 10, 2011) (where Debtor opened a single-party account, subsequent addition of spouse as co-owner was not sufficient to create a tenancy by the entirety); *Smart v. City of Miami Beach, Fla.*, 51 F. Supp. 3d 1299, 1303 (S.D. Fla. 2014) (same).[37]

Finally, the evidence here does not establish that all deposits into Checking Account 0050 after March 1, 2022, were "meant to be held as tenancy by the entireties."[38] For example, although Debtor's own paychecks—including a paycheck

---

[36] 569 B.R. 511 (M.D. Fla. 2017).
[37] *In re McCuan*, 569 B.R. at 519-20.
[38] Doc. No. 113, p. 4.

11

on March 11, 2022—were regularly deposited into Checking Account 0050,[39] Mr. Ingole's earnings were deposited into a different account: Money Market Account 0068.[40] In other words, it appears that deposits into Checking Account 0050 after March 1, 2022, were not—as suggested by Debtor—solely joint funds or the earnings of both spouses deposited into a common checking account.

On the evidence presented, the Court finds that Creditor met its burden of proving that Checking Account 0050 is not held by Debtor and Mr. Ingole as tenants by the entireties. Therefore, the Court will sustain Creditor's objection to Debtor's claim of exemption as to Checking Account 0050, and the exemption is disallowed.

B.     **Money Market Account 0068**

On October 14, 2021, Debtor opened Money Market Account 0068 at Suncoast with an initial deposit of $85,000.00, funds she withdrew from another Suncoast account, Savings Account 0000. The $85,000.00 was a portion of the proceeds from the sale of a home on Averly Street in Fort Myers, Florida (the "Averly Home") that Debtor and Mr. Ingole jointly purchased and owned during their marriage.[41]

---

[39] Debtor's Ex. 2, Doc. No. 99-2, p. 49.
[40] *Id.* at p. 51.
[41] On August 20, 2021, Debtor and Mr. Ingole sold the Averly Home and received net proceeds of $251,095.25 from the sale (Doc. No. 12, pp. 28, 32). The proceeds were initially deposited into Checking Account 0050 (Ch. 7 Trustee's Ex. 3, Doc. No. 102-3, p. 3), and later transferred to Savings Account 0000 (Debtor's Ex. 3, Doc. No. 99-3, p. 2).

At trial, the parties introduced into evidence two different signature cards for Money Market Account 0068, both dated October 14, 2021.

Creditor introduced Creditor's Exhibit 6: a copy of a Suncoast signature card that (1) identifies the Account Ownership as "Single Party" and "Payable on Death;" (2) is signed by Debtor as "Owner;" (3) is not signed by Mr. Ingole; (4) names Mr. Ingole as a "Beneficiary;" and (5) identifies Suncoast's "service center" and "processor" by number in the section marked for "Credit Union Use Only."[42] The Court notes that Debtor's signature on Creditor's Exhibit 6 appears to be an "electronic" signature.

Debtor testified at trial that Creditor's Exhibit 6 is not a complete copy of the signature card for Money Market Account 0068 because Mr. Ingole had not yet signed it. She testified that Mr. Ingole went to the bank "that same day" and "finished the document with his signature." Debtor also testified that Mr. Ingole has used Money Market Account 0068 since it was opened and that his earnings from Lincoln Heritage are directly deposited into Money Market Account 0068.[43]

Debtor introduced Debtor's Exhibit 1: a copy of a Suncoast signature card that appears identical to Creditor's Exhibit 6—including "Account#/Suffix 0068"—except that Debtor's Exhibit 1 (1) lists Mr. Ingole as a "Joint Owner;" (2) includes Mr.

---

[42] Creditor's Ex. 6, Doc. No. 101-6.
[43] *See, for example,* Debtor's Ex. 2, Doc. No. 99-2, pp. 11-12, 22.

13

Ingole's signature; and (3) does not include any information regarding Suncoast's processing services.[44]

Creditor did not offer any evidence or testimony from a records custodian or other representative of Suncoast regarding its account opening procedures or whether Suncoast used Creditor's Exhibit 6 or Debtor's Exhibit 1 as the operative signature card for Money Market Account 0068.

Notwithstanding the inconsistencies in the two signature cards, the Court finds that Money Market Account 0068 is an account held by Debtor and Mr. Ingole as tenants by the entireties for three reasons.

First, the Supreme Court of Florida in *Beal Bank* held that if a financial institution does not offer a tenancy by the entireties form of account ownership or expressly precludes that form of ownership, the "debtor may prove by other evidence an intent that the debtor and his or her spouse held the account as a tenancy by the entireties."[45]

Here, although Suncoast's signature card provides for joint ownership of the account—"Joint (Multiple Parties with Survivorship Rights)"—it neither provides a tenancy by the entireties form of ownership nor expressly precludes that form of ownership.[46] However, as allowed under *Beal Bank*, Debtor offered testimony and

---

[44] Debtor's Ex. 1, Doc. No. 99-1.
[45] *Beal Bank*, 780 So. 2d at 61.
[46] Debtor's Ex. 1, Doc. No. 99-1; Creditor's Ex. 6, Doc. No. 101-6.

evidence that she and Mr. Ingole intended Money Market Account 0068 to be held as a joint account. The evidence includes (1) Debtor's Exhibit 1 (Suncoast's signature card), (2) Debtor's Exhibit 3 (Suncoast's monthly account statements that reflect Mr. Ingole as a "Joint Owner"),[47] and (3) the deposit of Mr. Ingole's earnings into the account since the account was opened. The Court finds Debtor's testimony regarding the opening of Money Market Account 0068 on October 14, 2021, to be credible.

And consistent with Debtor's contention that Mr. Ingole is a co-owner of Money Market Account 0069, immediately after the account was opened, Mr. Ingole caused his earnings from Lincoln Heritage to be deposited into Money Market Account 0068. The evidence reflects that just four days after the account was opened and continuing through at least March 7, 2022, Mr. Ingole's earnings from Lincoln Heritage were deposited directly into Money Market Account 0068.[48]

Second, having determined that Money Market Account 0068 is a joint account, the Court finds that the account satisfies the six unities: the account was opened during Debtor's and Mr. Ingole's marriage; they share equal rights of possession, interest, and title; the account was opened and signed by Debtor as "Owner" and Mr. Ingole as "Joint Owner" on October 14, 2021, satisfying the unity

---

[47] Creditor objected to the admission of Debtor's Exhibit 3 (Suncoast's account statements) on the grounds of relevance and inadmissible parol evidence that cannot be used to contradict Suncoast's signature cards. The Court concludes that Exhibit 3 is admissible under *Beal Bank*; Creditor's objection is overruled.

[48] Debtor's Ex. 2, Doc. No. 99-2, pp. 11-12, 22, 31-32, 41-42, 51.

of time; and, although the account doesn't specify mutual survivorship rights, Mr. Ingole is listed as both a "Joint Owner" and the "Beneficiary" of the account. In other words, if Debtor were to die, Mr. Ingole would own the account either as the "Joint Owner" or as the "Beneficiary," and if Mr. Ingole were to pass away, Debtor would own the account as its "Owner."

Finally, even if the Court were to find that any of the unities necessary for Money Market Account 0068 to qualify as a tenancy by the entireties account are not present, the account was initially funded with $85,000.00 that Debtor and Mr. Ingole received from the sale of the Averly Home (the "Averly Proceeds"). Creditor does not dispute Debtor's testimony regarding the ownership of the Averly Home; therefore, the Averly Proceeds are presumed to have been entireties property when they were deposited into Money Market Account 0068 and did not lose their character as entireties property upon deposit.

For example, in *In re Benzaquen*,[49] the debtor's wife opened a savings account and the debtor was added to the account two days later, with the result that the account may not have satisfied the requirements for an entireties account. However, the account was funded solely by transfers from a "home account" belonging to the debtor and his wife, which contained the proceeds from the sale of their jointly owned home. The bankruptcy court ruled that "the funds transferred into the

---

[49] 555 B.R. 63 (Bankr. S.D. Fla. 2016).

Account were exempt funds, which did not lose their status just because the funds were placed into an account that may not have qualified as a TBE account."[50]

Here, as in *Benzaquen*, Money Market Account 0068 was funded with entireties property—the Averly Proceeds—and the funds retained their entireties status after the deposit regardless of the questions surrounding the conflicting signature cards. And the Court notes that the funding of Money Market Account 0068 with entireties property supports Debtor's testimony that the account was created as a joint account with Mr. Ingole.

Having carefully considered the evidence, the Court finds that Creditor failed to meet its burden of proving that Money Market Account 0068 was not held by Debtor and Mr. Ingole as tenants by the entireties, and Debtor's claim of exemption as to Money Market Account 0068 is allowed.

### III. CONCLUSION

The Court finds, first, that Checking Account 0050 (a) is not exempt as a head of family wage account under Fla. Stat. § 222.11(2)(b) because Debtor waived the exemption in a Guaranty signed in 2006; and (b) is not exempt as an account held as tenants by the entireties because Mr. Ingole expressly relinquished his ownership interest in the account in 2014.

---

[50] *In re Benzaquen*, 55 B.R. at 68-69.

Second, the Court finds that the funds on deposit in Money Market Account 0068 are held by Debtor and Mr. Ingole as tenants by the entireties because (a) the evidence supports a finding that the account is jointly owned; (b) the six unities necessary to establish the presumption that the account is owned as tenancy by the entireties are present; (c) the account was funded with the sale proceeds of tenancy by the entireties property—the Averly Home; and (d) Creditor did not rebut the presumption.

Accordingly, it is

**ORDERED:**

1. Creditor's Objection (Doc. No. 38) is **SUSTAINED** as to Checking Account 0050, and Debtor's claim of exemption as to Checking Account 0050 is disallowed.

2. Creditor's Objection (Doc. No. 38) is **OVERRULED** as to Money Market Account 0068, and Debtor's claim of exemption as to Money Market Account 0068 is allowed.

The Clerk's office is directed to serve a copy of this Order on interested parties via CM/ECF.